116 F.3d 28
 Bert HETCHKOP, in his fiduciary capacity as Director, and
the New York City District Council of Carpenters Welfare
Fund, Pension Fund, Vacation Fund, Annuity Fund,
Apprenticeship, Journeyman Retraining, Educational and
Industry Fund, and Supplemental Fund, Plaintiffs-Appellees,
v.
WOODLAWN AT GRASSMERE, INC., Defendant-Appellant.
 No. 369, Docket 96-7221.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 29, 1996.
Decided Feb. 4, 1997.
 
 Richard M. Betheil, New York City (Philip R. Hoffman, Tina C. Kremenezky, Pryor, Cashman, Sherman & Flynn, on the brief), for Plaintiffs-Appellees.
 Robert M. Blakeman, Valley Stream, NY (Robert M. Blakeman & Associates, on the brief), for Defendant-Appellant.
 Before: KEARSE, WALKER and JACOBS, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendant Woodlawn At Grassmere, Inc. ("Woodlawn" or the "Company"), appeals from a judgment of the United States District Court for the Southern District of New York, Louis L. Stanton, Judge, ordering it to pay $135,421.59 to the plaintiff employee benefit funds (the "Funds") as contributions due under a collective bargaining agreement, plus $38,226.57 in attorneys' fees and disbursements. The district court granted partial summary judgment dismissing Woodlawn's defense of fraud in the execution of the agreement. On appeal, Woodlawn contends principally that it presented evidence sufficient to create triable issues of fact foreclosing the entry of summary judgment against it. We agree and therefore vacate the judgment and remand for trial.
 
 I. BACKGROUND
 
 2
 Woodlawn is a construction company organized for the purpose of constructing 14 housing units in Staten Island, New York. The present suit was brought by the Funds pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(3) and 1145 (1994), and the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1994), to recover contributions from Woodlawn due pursuant to a collective bargaining agreement between Woodlawn and the local carpenters union (the "Union"). The Funds alleged that the collective bargaining agreement was, in all pertinent respects, unlimited.
 
 
 3
 Woodlawn defended by asserting that it had reached agreement with the Union for only a limited obligation; that Woodlawn's chief officer Bruce DiGiovanni had been shown such a limited document, which he was about to sign; and that without Woodlawn's knowledge, the document purporting to impose an unlimited obligation had been fraudulently substituted for the limited agreement while one of the Union representatives deliberately distracted DiGiovanni. The events as described by DiGiovanni in his deposition and affidavit, taken in the light most favorable to Woodlawn as the party against whom summary judgment was granted, were as follows.
 
 
 4
 In November 1987, after finishing the foundations on five of its planned 14 units using predominantly nonunion workers, Woodlawn determined that it needed additional workers to complete the framing of forms for the pouring of the remaining nine concrete foundations. Accordingly, DiGiovanni contacted the Union to seek laborers for that limited task. DiGiovanni told Union representatives Harlow Haagensen and Stanley Solaas that DiGiovanni "would require only enough personnel to complete the carpentry work of framing the forms for the pouring of the nine remaining foundations and that the balance of my carpentry work such as framing, installation of windows, etc., would be predominately performed by a carpentry contractor and or other contractors." (Affidavit of Bruce DiGiovanni dated July 15, 1994 ("DiGiovanni Aff."), p 6.) In connection with DiGiovanni's request, Charles Riggio, an Employer Coordinator for the Funds, prepared a "Collective Bargaining Agreement Preparation Form" ("Prep Form") in accordance with Union procedures (Affidavit of Charles Riggio dated June 22, 1994 ("Riggio Aff."), p 8), which included the notation that the type of work the Union laborers were to perform for Woodlawn was "Foundations & Forms."
 
 
 5
 Haagensen told DiGiovanni that the parties would need to execute a formal collective bargaining agreement even though the job called only for completion of framing for the nine foundations; DiGiovanni agreed to execute such an agreement. On the following day, Haagensen drove DiGiovanni from Staten Island to Union headquarters in Manhattan to execute the labor agreement. There, DiGiovanni met with Solaas and reiterated that he wanted to hire Union laborers just to "complete the nine remaining foundations." (DiGiovanni Aff. p 8.) Solaas and Haagensen first showed DiGiovanni a standard Union contract that set forth the terms for employing Union laborers, which included the requirement that an employer hire only Union laborers to complete work covered under the agreement and that it contribute to Union fringe benefit funds for each hour of work performed under the agreement. Solaas assured DiGiovanni that the agreement would be modified to reflect that it was applicable solely to the construction of Woodlawn's nine foundation forms; Solaas then left the room, returned some five minutes later with a modified contract, and showed DiGiovanni the first page, on which had been inserted words to the effect of "For foundation forms only." (Id. p 9.) Solaas asked if the modified agreement was satisfactory, and DiGiovanni stated it was.
 
 
 6
 At that moment, Haagensen abruptly stood up and announced that he was leaving. DiGiovanni turned away from the agreement for approximately six or seven seconds to remind Haagensen that he had promised to drive DiGiovanni back to the Staten Island jobsite. When DiGiovanni turned back to the document, Solaas had opened it the last page and was indicating where DiGiovanni was to sign; DiGiovanni signed without reading or reinspecting any of the earlier pages. After DiGiovanni signed, Solaas immediately left the room with the signed document and shortly returned with an envelope into which he put the document and other materials, and handed the envelope to DiGiovanni.
 
 
 7
 The document DiGiovanni signed, however, did not bear a legend to the effect of "For foundation forms only," which DiGiovanni had seen on the document he had prepared to sign; nor did it contain any other language reflecting that Woodlawn's obligation was limited. Instead, it required Woodlawn to pay benefits for both union and nonunion workers performing carpentry work and to pay benefits with respect to any kind of carpentry work, not just that relating to the foundation forms. (See Riggio Aff. p 14.) DiGiovanni, having emphasized to the Union officials that he wanted only a limited contract, and having been shown by them a modified contract "For foundation forms only," believes that Solaas substituted the unlimited document while Haagensen intentionally distracted him. (DiGiovanni Aff. p 15, 19.)
 
 
 8
 DiGiovanni did not look at the document that had been placed in the envelope until the present dispute arose some months later. The dispute arose when, after Woodlawn had made contributions for the Union employees with respect to the framing of five foundations, the Union began to demand contributions for all carpentry work. DiGiovanni called Solaas to remind him that Woodlawn's contract was limited; Solaas's response was, " 'I don't remember'." (Id. p 14.) After another Union representative came to the jobsite and demanded "a pay off of $5,000.00, to straighten out the situation," Woodlawn "threw the union off the job." (Id.)
 
 
 9
 The Funds brought the present lawsuit seeking to enforce the agreement as signed. Woodlawn contended that the agreement sued on was void because it had been procured by a fraudulent substitution of documents, i.e., by fraud in the execution. The Funds moved for summary judgment dismissing this affirmative defense, contending that DiGiovanni did not see or hear any substitution of documents and had no other witness to a substitution. They submitted an affidavit from Funds employee Riggio, who stated that the Union "would not" have entered into a limited agreement of the type DiGiovanni contends he negotiated with Solaas and Haagensen (Riggio Aff. p 17). Riggio did not remember the Woodlawn contract in particular, however (id. p 8), and he was not present at the signing (DiGiovanni Aff. p 17). The Funds did not submit an affidavit from either Solaas or Haagensen.
 
 
 10
 The district court, in a Memorandum and Order dated February 1, 1995, 1995 WL 43685 ("Opinion"), granted the Funds' motion to dismiss the fraud-in-the-execution defense, finding that Woodlawn had not shown that the agreement it believed it was signing was entirely different from the document it had signed. Noting that fraud in the execution is not a tenable defense unless one "party executes an agreement with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms," Opinion at 8 (internal quotation marks omitted), the district court found that DiGiovanni "had a reasonable opportunity to acquaint himself with the terms of the Agreement both before and after he signed it," id. at 9, and that "[t]he agreement to which DiGiovanni allegedly assented and the Agreement [he ultimately signed] were not 'entirely different,' " id. at 8.
 
 
 11
 Both were collective bargaining agreements. They contained identical provisions regarding payment of fringe benefits on behalf of employees, sub-contracting work to non-union companies, and maintaining union conditions when performing non-covered carpentry work, the provisions at issue in this action. Woodlawn has not shown how the "Foundation forms only" legend would have obviated all of those provisions.
 
 
 12
 Id. at 8-9 (footnote omitted). The court stated that DiGiovanni "received a copy of the Agreement ... at the time he signed the Agreement" and that "[h]e was not rushed to sign" it. Id. at 9. The court also stated that
 
 
 13
 DiGiovanni was not interested in dealing with paperwork or reviewing the collective bargaining agreements governing his project site. He relied on his shop steward to keep him apprised of his obligations under the collective bargaining agreements.... He never opened letters from the Funds, preferring instead to hand them over to his attorney.... As a "worker in the field," DiGiovanni "hate[s] paperwork."....
 
 
 14
 Woodlawn argues that the Union must have defrauded it because a single term, the wording of which DiGiovanni cannot remember, did not appear in the agreement he did not read. Woodlawn proffers no evidence other than DiGiovanni's inference from events at the signing in support of its fraud defense.
 
 
 15
 Id. at 9-10. Finding that "DiGiovanni's conclusory allegation" did not raise a triable issue of fact, the district court summarily dismissed Woodlawn's affirmative defense and granted summary judgment in favor of the Funds on the issue of Woodlawn's liability. Id. at 10.
 
 
 16
 A final judgment was eventually entered ordering Woodlawn to pay the Funds damages, interest, and statutory penalties totaling $135,421.59, plus reasonable attorneys' fees, costs, and disbursements totaling $38,226.57. This appeal followed.
 
 II. DISCUSSION
 
 17
 Fraud in the execution occurs where there is a "misrepresentation as to the character or essential terms of a proposed contract," and a party signs without knowing or having a "reasonable opportunity to know of its character or essential terms." Restatement (Second) of Contracts § 163 comment a (1981) ("Restatement "); see E. Farnsworth, Contracts § 4.10, at 249 (2d ed.1990) (fraud in the execution occurs when a party's "misrepresentation is regarded as going to the very character of the proposed contract itself" and when the "other party neither knows nor has reason to know of the character of the proposed agreement"). See generally George v. Tate, 102 U.S. 564, 570, 26 L.Ed. 232 (1880) ("surreptitious substitution of one paper for another"). Such a fraud causes a party "to believe that the act which he does is something other than it actually is." 12 S. Williston, A Treatise on the Law of Contracts § 1488, at 332 (3d ed.1970); see, e.g., Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 774 (9th Cir.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 999 (1987). In order to prevail on such a defense, a party must show "excusable ignorance of the contents of the writing signed." Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir.1992) (internal quotation marks omitted); see, e.g., Connors v. Fawn Mining Corp., 30 F.3d 483, 491 (3d Cir.1994); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d at 774; Restatement § 163 comment a (party must "not know or have reasonable opportunity to know of its character or essential terms").
 
 
 18
 Proof that a party secretly substituted one type of document for another is evidence of fraud in the execution. See, e.g., Operating Engineers Pension Trust v. Gilliam, 737 F.2d 1501, 1504 (9th Cir.1984) ("one who signs a promissory note reasonably believing he only gave his autograph is not liable on the note"). In addition, the defense may apply to the substitution of a document of the same kind where the new document introduced important terms that were materially different from those to which the party had agreed. See, e.g., Connors v. Fawn Mining Corp., 30 F.3d at 493; Restatement § 163 illustration 2 ("A and B reach an understanding that they will execute a written contract containing terms on which they have agreed. It is properly prepared and is read by B, but A substitutes a writing containing essential terms that are different from those agreed upon and thereby induces B to sign it in the belief that it is the one he has read. B's apparent manifestation of assent is not effective.").
 
 
 19
 In Connors v. Fawn Mining Corp., for example, the court dealt with an employer who contended that the collective bargaining agreement it had signed contained a term to which it had not agreed. The court stated that
 
 
 20
 if Fawn Mining was in fact led to believe that it was signing an agreement that did not include this [concededly important] provision, an agreement that did contain this provision would be "radically different" from one which did not.... Therefore, Fawn Mining's defense falls within the definition of fraud in the execution....
 
 
 21
 If an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud in the execution of the contract and that the agreement reflected in the executed document is void ab initio and unenforceable by the union.
 
 
 22
 30 F.3d at 492-93.
 
 
 23
 As Connors indicates, fraud in the execution, if established, renders a purported agreement void ab initio. See id. at 493; MacKillop v. Lowe's Market, Inc., 58 F.3d 1441, 1443 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 914, 133 L.Ed.2d 844 (1996). A contract that is void ab initio is a "nullity," Schneberger v. Wheeler, 859 F.2d 1477, 1481 (11th Cir.1988), cert. denied, 490 U.S. 1091, 109 S.Ct. 2433, 104 L.Ed.2d 989 (1989); see Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1271 (D.C.Cir.1994); Restatement § 163 comment a, for it is based on a "promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor," id. § 7 comment a. See Connors v. Fawn Mining Corp., 30 F.3d at 493 (employer may defeat action to enforce collective bargaining agreement by proving fraud in the execution); Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc., 85 F.3d 1098, 1108 (3d Cir.1996) (same); Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir.), cert. denied, 498 U.S. 982, 111 S.Ct. 511, 112 L.Ed.2d 524 (1990) (employer may defeat ERISA action for benefits fund contributions by showing that the agreement sued on is not merely voidable but void).
 
 
 24
 The principles governing decision and review of a motion for summary judgment are well established. The court is required to view the evidence in the light most favorable to the party against which summary judgment is sought and to draw all permissible inferences in favor of that party. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.1996). If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper. See, e.g., id. at 1014; Finley v. Giacobbe, 79 F.3d 1285, 1291 (2d Cir.1996). In considering the evidence of record, the court is not to make assessments of the credibility of witnesses. See, e.g., Weyant v. Okst, 101 F.3d 845, 854 (2d Cir.1996); Fed.R.Civ.P. 56(e) Advisory Committee Note (1963). Credibility assessments, choices between conflicting versions of the events, and weighing of the evidence are matters for the jury, not for the court on a motion for summary judgment. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S.Ct. at 2513-14; Rule v. Brine, Inc., 85 F.3d at 1011.
 
 
 25
 Within this substantive and procedural framework, we have several difficulties with the district court's summary dismissal of Woodlawn's fraud-in-the-execution defense, for DiGiovanni's affidavit and deposition testimony, if credited, provided evidence from which a reasonable jury could draw inferences in the Company's favor with respect to both elements of that defense. First, contrary to the district court's characterization of DiGiovanni's statements as "conclusory," his account of the events surrounding the signing of the document was quite detailed. DiGiovanni described several conversations in which he had asked for a limited contract; and the jury could construe the "Foundations & Forms" notation that Riggio made in connection with DiGiovanni's request as reflecting acknowledgment of a limited request. The jury could also reject Riggio's statement that the Union "would not" have entered into a limited agreement with Woodlawn. DiGiovanni stated that Haagensen and Solaas did agree to such a contract; that after showing him the standard contract, Solaas said that that contract would be modified; that Solaas then left the room with the standard document and returned with a document that had on it words to the effect of "foundation forms only"; that as soon as DiGiovanni saw that limitation and said he would sign, Haagensen abruptly announced that he was leaving, despite having promised to drive DiGiovanni back to the jobsite in Staten Island; that for some six or seven seconds, DiGiovanni turned away from the document containing the limiting language in order to deal with the prospective loss of his ride; that when he turned back, Solaas presented him with a document opened to the signature page; and that DiGiovanni signed, but eventually discovered that the document he signed was not the document he had been shown and was prepared to sign immediately before Haagensen's distraction. To be sure, DiGiovanni could not say that he saw Solaas switch documents; but his testimony that the document he signed was not the one he had just been shown, together with his description of the events, including Haagensen's distraction, constituted evidence from which a reasonable factfinder would be permitted to infer that there had been a surreptitious substitution. It was not within the province of the district court to reject DiGiovanni's version of the events or to refuse to draw permissible inferences in Woodlawn's favor.
 
 
 26
 Second, the district court's rejection of the fraud-in-the-execution defense on the basis that "[b]oth [documents] were collective bargaining agreements," had some provisions in common, and were "not 'entirely different,' " Opinion at 8, reflected an unduly narrow view of the law. As discussed above, the substituted document need not be a different type of instrument for the defense to succeed; even if the party knew the basic nature of the document, the defense is applicable if the party did not know and had no reasonable opportunity to know that a page with materially changed terms had been substituted.
 
 
 27
 The district court's reliance on Mason Tenders District Council Welfare Fund, Pension Fund and Annuity Fund v. Lupo, 90 Civ. 6204, 1992 WL 236179 (S.D.N.Y. Sept. 8, 1992), which in turn relied on Southern California Retail Clerks Union and Food Employers Joint Pension Trust Fund v. Bjorklund, 728 F.2d 1262 (9th Cir.1984), as support for its summary rejection of Woodlawn's fraud-in-the-execution defense was misplaced. Both of those cases involved defenses more properly characterized as fraud in the inducement (which makes a contract not void but merely voidable). Neither opinion indicates that there was any evidence or allegation of a document switch.
 
 
 28
 Third, the district court's statements that DiGiovanni had a reasonable opportunity to obtain knowledge of the character and essential terms of the document he signed, and that he was "not rushed to sign" it, improperly resolved questions of fact by drawing inferences adverse to Woodlawn. Whether Haagensen's ploy of announcing his departure, knowing that DiGiovanni was depending on him for transportation, had the effect of rushing DiGiovanni into signing was surely a question of fact. If the jury were to credit the account of the events given by DiGiovanni, it could reasonably find that the Union officials had deliberately perpetrated a distraction in order to permit a substitution; that the nature of the distraction caused DiGiovanni to rush to sign the document Solaas was handing him; that DiGiovanni had no reason to suspect that the document he signed was not the limited one he had been shown just seconds before; and that DiGiovanni did not have a reasonable opportunity to learn that the document to whose last page Solaas had turned was unlimited. Our ruling does not relax the basic responsibility of contracting parties to review a document before signing it. On this record, a jury could find that DiGiovanni did diligently review what he was about to sign, but that his diligence was thwarted by a quick and undetected switch of documents immediately after his review and prior to his putting pen to paper.
 
 
 29
 We note that the district court also stated that DiGiovanni had an opportunity to examine the document "after" he had signed. We assume that the court did not mean to suggest that simply because DiGiovanni could have learned of the substituted terms after he had signed and been given a copy the fraud-in-the-execution defense was unavailable in principle. A party is bound by a contract it has signed unless it can show special circumstances that relieve it of the contractual obligation. See generally Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir.1993); Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 845 (2d Cir.1987). If the party did not know and did not have a reasonable opportunity to know before signing that the terms had been materially changed, it has a fraud-in-the-execution defense because that fraud is a special circumstance that makes the undertaking unenforceable. It seems more likely that the district court was expressing skepticism of DiGiovanni's statements. The court's observations that DiGiovanni did not immediately look at the agreement that had been put in the envelope, that he was more interested in construction work than in reviewing the contracts he had signed, and that he did not recall the exact wording of the limiting legend he says he saw on the modified agreement he was shown, went only to the matter of DiGiovanni's credibility. The district court's apparent doubts as to the likely veracity of DiGiovanni's account, however, are not a proper basis for the granting of summary judgment against his company.
 
 
 30
 We conclude that Woodlawn presented sufficient evidence to defeat the motion for summary judgment dismissing its fraud-in-the-execution defense.
 
 CONCLUSION
 
 31
 We have considered all of plaintiffs' arguments in support of the partial summary judgment dismissing Woodlawn's fraud-in-the-execution defense and have found them to be without merit. We note that Woodlawn also urges that we order the entry of summary judgment in its favor because plaintiffs did not proffer any evidence, such as an affidavit from Haagensen or Solaas, to dispute DiGiovanni's version of the events. Woodlawn is not entitled to that relief. Because Woodlawn did not cross-move for summary judgment in the district court, plaintiffs were under no obligation to come forward with evidence in order to avoid the entry of summary judgment against them.
 
 
 32
 The judgment of the district court is vacated, and the case is remanded for further proceedings not inconsistent with this opinion. The costs of this appeal shall abide the ultimate outcome of the action.